## Alvin Schulze v. George W. Jalonick et al.

### Decided February 23, 1898.

**1. Libel—Mitigation—Plaintiff's Reputation as to Offense Charged.**

In mitigation of damages recoverable for libel, evidence is admissible, not only of plaintiff's general reputation, but of general repute as to his connection with a particular offense alleged to have been libelously charged upon him.

**2. Same—Reputation in Disproof of Malice.**

General repute of the fact defendant is accused of libelously publishing, though not admissible to prove such fact, may be received to show good faith of the publication, where in issue, though such general reputation was not shown to have been known to defendant, where the information on which he acted was of such character as to imply that it was based, to some extent, on repute.

**3. Evidence—Immaterial Error.**

A case should not be reversed for the improper admission of evidence, the exclusion of which could not change the result.

**4. Same—Part Admissible—Objection to Whole.**

It is not ground for reversal that part of certain testimony was inadmissible where the objection was to the whole.

**5. Libel Evidence—Subsequent Publications.**

Evidence of similar charges made against other parties than plaintiff and referring to distinct transactions is not admissible as bearing on the spirit and intent of the alleged libelous publications about plaintiff.

**6. Libel—Subsequent Publications by Defendant.**

Evidence of the subsequent publication of the charge declared on as libelous, in a slightly modified form, is not admissible as to show the meaning of the original publication, where not pleaded.

**7. Libel—Acts of Agent.**

An insurance company which had furnished a pamphlet to its agent for his instruction and control in making contracts, is not liable for his unauthorized act in exhibiting to the public the alleged libelous statements contained therein.

**8. Libel Per Se—Charge of Court.**

An instruction requiring the jury, in order to find for plaintiff, to find that the alleged charge (running a "blind tiger" where sales of intoxicating liquors were prohibited) was libelous, is not erroneous where the jury were elsewhere told that the publication in question was a libel and would entitle plaintiff to damages.

**9. Same.**

An instruction which left to the jury the question whether the statement declared on was libelous, and in other charges submitted the question whether the publication charged the act (keeping a "blind tiger") upon plaintiff, but instructed them that the publication, if made concerning plaintiff, was libelous, should be understood as making the question depend on whether such charge was made concerning plaintiff, not whether, if so made, it was of a libelous nature.

**10. Libel—Privileged Communication.**

A communication made in good faith in reference to a matter in which the person communicating has an interest, is privileged if made to another for the purpose of protecting that interest.

**11. Same—Insurance Company—Communication to Agent.**

The manager of an insurance "rating bureau" printed and furnished to an insurance company, for the guidance of its agents, a description of the property in a town where the sale of liquor was prohibited, stating the "ownership" and "occupancy" and showing the ownership of certain premises to be in plaintiff and the occupancy, "blind tiger," by which was understood an establishment for selling liquor secretly in violation of law. The business carried on being an element affecting the rates of insurance, such communication to the agent was privileged; no malice was implied from its publication; if made in good faith, no cause of action arose; and the unauthorized act of the agent in making the contents of the pamphlet public created no liability against any but himself.

APPEAL from Hays.   Tried below before Hon. H. TEICHMUELLER.

The case on a previous appeal is reported in 14 Texas Civil Appeals, 656.

*L. H. Browne* and *Owen Ford,* for appellant.

*Leake, Henry & Greer,* for appellee.

FISHER, CHIEF JUSTICE.—There is an action for libel by appellant against Jalonick and the Pennsylvania Fire Insurance Company, based upon a publication wherein it is alleged the appellant was charged with running a "blind tiger," meaning that he was guilty of the offense of violating the local option laws in San Marcos, Hays County, at a time when local option was in force in that county. Trial in the court below resulted in a verdict in favor of the defendants.

There is evidence in the record which warrants this court in finding the following facts: The appellee, Jalonick, about the time alleged in the petition, published a pamphlet, which contains among other matters the following:

| Map No. | OWNER          OCCUPANCY | Stories | Class | Gr.Tl'r Oc | Rates | | Revised Rates | |
|---------|--------------------------|---------|-------|------------|-------|-------|---------|--------|
|         |                          |         |       |            | Bld'g | Con't | Bld'g | Con't |
| Block 12 | Guadalupe Street        |         |       |            |       |       |       |       |
| 401 | Jno. Cape..............Dwelling | 1 | D | 1 | 1 50 | 1 50 | | |
| 402 | L. J. Dailey.......... " | 1 | D | 1 | 2 00 | 2 00 | | |
| 423 | S. B. Bales........... " | 1 | D | 1 | 1 25 | 1 25 | | |
| 424 | Chas. Wetzel.......... " | 1 | D | 1 | 1 25 | 1 25 | | |
| 426–31 | Various Negro Shanties......... | 1 | D | 6 | 2 50 | 2 20 | | |
|         | San Antonio Street       |         |       |            |       |       |       |       |
| 713 | Lucius Daily........Blacksmith | 1 | D | 1 | 5 50 | 5 00 | | |
| 715 | Opera House Co. ...Opera House | 1½ | D | 1 | 6 50 | 5 50 | | |
|     | Opera House discontinued, bld'g now used for church. | | | | | | | |
| 716 | Jeff Travis.............Groceries | 2 | D | 1 | 6 50 | 5 50 | | |
| 735 | S. B. Bales ........Livery Stable | 1 | D | 1 | 6 50 | 5 50 | | |
| 736½ | Billingsly & Taylor......Various | 1 | D | 3 | 5 00 | 4 00 | | |
| 737 | E. Ahrenbeck, Jew'lry and pianos | 1 | 1C | 1 | 5 00 | 4 00 | | |
| 738 | "      H'dwre and tin shop | 2 | 1C | 1 | 5 00 | 4 00 | | |
| Block 13 | South Side Square      |         |       |            |       |       |       |       |
| 739 | Mrs. M. M. Pitchford...Tin shop | 1 | D | 1 | 5 75 | 5 00 | | |
| 740 | "        Dry Goods | 1 | D | 1 | 5 75 | 5 00 | | |
| 741 | "        ...Confec. | 1 | D | 1 | 5 75 | 5 00 | | |
| 742 | "        ... Vacant | 1 | D | 1 | 5 75 | 5 00 | | |
| 743 | Chas. Bock...........Groceries | 1 | D | 1 | 5 75 | 5 00 | | |
| 744 | "   ...Drugs and Confec. | 2 | B | 1 | 2 75 | 2 20 | | |
| 745 | "   .............. Drugs | 2 | B | 1 | 2 15 | 1 90 | | |
| 746 | Mrs. O. Simon..........Confec. | 1 | D | 1 | 2 90 | 2 75 | | |
| 747 | Alvin Schulze ...."Blind Tiger" | 1 | B | 2 | 2 50 | } 5 00 | | |
| in rear | "   ........W. House | 1 | 1C | 1 | 2 50 | | | |
| 748 | "   ...Hdwre and Gro. | 1 | B | 2 | 2 50 | } 2 25 | | " |
| in rear | "   ........W. House | 1 | 1C | 1 | 2 50 | | | |
| 749 | M. K. Farris......Feed and Hay | 1 | D | 1 | 3 75 | 3 40 | | |
| 750 | "   ............. Lunch | 1 | D | 1 | 3 75 | 3 40 | | |

Upon the page of the publication noticed appears the name of plaintiff, Alvin Schulze, as the owner of a certain building, and under the word "occupancy" appear the words "blind tiger." This book or pamphlet

which contains this publication was gotten up and published by Jalonick at a time when he was the manager of the Texas Survey and Rating Bureau, a business then engaged in by him for the benefit of the appellee, the Pennsylvania Fire Insurance Company, and other insurance companies doing business in Texas in rating property within this State as the basis for insurance, and the facts warrant the conclusion that previous to the time of this publication there was an understanding between the insurance companies and Jalonick that he should make such publications or reports showing the condition of property situated in towns within this State, and such reports or publications, when made, were to be used by the insurance companies as their basis for rates of insurance; and we find that the pamphlet in question was published by Jalonick for that purpose, and we find that it was a part of his duty, in making the publications, to state the truth, and to give correct information for the guidance of the insurance companies, and show the position and the occupancy of the property, and that the occupancy of a building affects the price or rates of insurance. We find that the publication was not for circulation generally, but was intended to be used only for the purpose of conveying correct information to the insurance companies, and to be used by them and their agents, and that they were delivered by Jalonick for that purpose, and that the defendants did not authorize an exhibition of these publications to the public generally by the subordinate agents of the insurance companies. We do not find that the publication in express terms charges the appellant with conducting a "blind tiger," and its meaning in this respect is somewhat doubtful; but there is evidence in the record which would warrant the jury in concluding that the publication did not charge Schulze with conducting or running a "blind tiger," but that it indicated only that the building was occupied by some one for that purpose.

A "blind tiger" we find to be a place where such intoxicating drinks as are prohibited by the local option law are disposed of or sold in violation of that law. We find that at the time of the publication the local option law was in force at San Marcos, Hays County, Texas, and that the publication referred to buildings situated in that town. There is also evidence which justifies the finding that at the time of the publication the building owned by Schulze was then actually occupied and used for the purpose of disposing of intoxicating drinks in violation of the local option law. We also find that many of the residents of San Marcos who were acquainted with Schulze construed the publication to mean that he was conducting a "blind tiger" in the building owned by him, and there is some evidence which tends to show that his reputation and good standing was affected by this publication; and there is also evidence which tends to show that prior to the publication there was current a general rumor to the effect that he was connected with the business carried on in the building, but as a fact, we find that such was not the case.

The first question presented is as follows: "The court erred in over-

ruling the objections of plaintiff, and permitting the defendants to show, by the following witnesses, G. G. Johnson, William Dwyer, B. W. Smith, Jr., Claud Ivey, J. J. Barbee, T. F. Hewitt, Philip Springer, and W. C. Dugger, the testimony as shown and set forth in plaintiff's bill of exceptions number 1, that plaintiff's building, as designated in exhibit 'A' in evidence, from January 6, 1892, the time that local option went into full force and effect in Precinct No. 1, to the date of the publication of the pamphlet 'Exhibit A,' to wit, June 30, 1892, was generally reputed and norated in San Marcos as a place where intoxicating liquors were sold in violation of the local option law, some of the witnesses denominating it a 'blind tiger,' and connecting plaintiff with it as keeping it, and from the fact that a 'blind tiger' was commonly and notoriously reported as being run there, was not communicated to Jalonick by Dugger, which character of evidence was wholly irrelevant, hearsay, and could not be introduced even to mitigate damages, and under the rules of evidence was altogether inadmissible."

There are no propositions under this assignment, but two objections to the evidence may be carved out of it: First, that general repute was not admissible to connect plaintiff with the crime charged. Second, that the crime itself could not be proven by general reputation, even in mitigation of damages, unless the publisher of the libel at the time knew of such general rumor. It is not pretended that this testimony would be admissible in justification, but its purpose was simply in mitigation of the damages, and as having some bearing in disproving a malicious intent to publish and circulate a libel.

Speaking to the first objection, it is clear that, by the decided weight of authority, evidence of the plaintiff's general reputation in the respect in which it is assailed by the alleged libel is admissible in mitigation of damages; but there is much diversity of opinion as to the admissibility of evidence tending to show that it was generally reputed that the plaintiff was guilty of the crime charged. The evidence of general character, if admitted, could only be considered in mitigation of the damages sustained by the plaintiff, and this upon the theory that a person with an already tarnished reputation is not as likely to suffer damages thereto to the same extent as one of unblemished character. The effect of the libel upon the plaintiff's reputation is the principal element of damage, and if it may be shown in mitigation that his general reputation in the respect in which it is assailed is bad, no substantial reason can be given why a like inquiry can not be made into the general repute as to his connection with the crime. The general consensus of opinion among his neighbors of his guilt of the crime, that existed prior to the alleged libel, affects in some degree his reputation and standing in the community, and if his previous good reputation, by reason of this opinion, is impaired, it would have as important a bearing on the amount of damages he had sustained by reason of the publication as would his general reputation, in the respect in which it was assailed by the libel. In Blickenstaff v. Perrin, 27 Indiana, 528, it is said: "If before the speaking of the

words complained of there exists a general rumor or suspicion that the party is guilty of the criminal act charged against him, the character is already traduced, and the evidence is in effect the same as that of general bad character in reference to the crime imputed."

In the case of Wetherby v. Marsh, 20 New Hampshire, 561, the sole question was whether evidence of a general report that the plaintiff had committed the crime was admissible. The court, after discussing authorities, says: "But the evidence is only admitted in mitigation of damages; and if in point of fact the reputation of the plaintiff has become fixed in respect to the crime imputed, by the common speech of men before the utterance of the words complained of, it is obvious that the mischief occasioned by them is less than if they had been the first cause of the general suspicion, and had in any just sense given birth to the infamy under which the plaintiff suffers.

"There is certainly a distinction between the two cases, which ought to be recognized, in favor of the party who has committed only the minor offense of charging a crime that the accused has been so generally believed guilty of that he has suffered but little by the slander. The jury alone can appreciate that difference by determining, upon the evidence, how far the plaintiff had been sunk in infamy before the weight of the slander complained of was added, and how far the aspersions cast by the defendant have deepened the infamy, if at all.

"We conclude, therefore, in the conflict of opinion which has undoubtedly existed on this question, that the better reason is with those who admit the evidence to go to the jury, to show that however unable the defendant has been to prove the truth of the words uttered, yet the calumny they contain is one under which the plaintiff so unquestionably lay before they were spoken, that less damage has resulted from them than if the reputation which they aspersed had been previously pure.

"The defendant had spoken words charging the plaintiff with having burned his buildings and the buildings of others. Now, if before these words were spoken it had been generally reported and believed that the plaintiff had committed those acts, still, if the words were untrue, they were unjustifiable. But to say that they did the plaintiff as much damage as if they had first caused the belief or suspicion of his guilt, would seem to confound a plain and recognized distinction.

"How generally this belief prevailed, how firmly it was founded in the common mind, and to what extent it excused or palliated the conduct of the defendant, were questions for the jury to entertain, and were proper subjects for their consideration in assessing damages or determining whether any had been sustained."

This we believe to be the correct rule. Among the cases which may be cited in support of this principle are: Case v. Marks, 20 Conn., 248; Fuller v. Dean, 31 Ala., 656; Heilman v. Shanklin, 60 Ind., 424; Barr v. Hock, 46 Iowa, 310; Duval v. Davey, 32 Ohio St., 611.

In addressing ourselves to the second objection, we meet with more difficulty. It does not appear that Jalonick prior to making the publica-

tion had any express information as to the common report in the neigh-
borhood that a "blind tiger" was being conducted in the building, but
he was informed by a local insurance agent stationed at San Marcos that.
the building was used in carrying on a "blind tiger." Jalonick asked the
local agent who owned the building. He replied, Alvin Schulze. Then
asked, "What is the occupancy?" The local agent stated, "I reckon you
can call it a 'blind tiger.'" Jalonick replied, "Oh, no, I guess not; you
have local option here; you are joking about it." The local agent replied,.
"That is right; you put it down that way."

This agent, Mr. Dugger, testified, when Jalonick requested informa-
tion from him as to the occupancy, of the building, that he told him, "I
don't know what to tell you, only a 'blind tiger;'" and that "Mr. Jalonick
generally accepted the information he got from me. I knew the general
reputation of this house as to the occupation carried on in it at the time
that I gave Mr. Jalonick this information. It was that whisky was being
sold there in violation of the law. Up to that time I did not know what a
'blind tiger' was; I supposed it meant a violation of the law. I knew
liquor was being sold there openly, and wanted to convey the idea to him
that it was sold secretly, that it was being done under cover, so that no-
body could know."

Evidence of common repute, in order to establish the crime, would not
be admissible for that purpose where the effort to justify the publi-
cation; but if the publication charged that a crime was committed, it
would be proper to show what information the publisher had previously
received upon that subject, as evidence tending to disprove malice, and
thereby mitigate the offense, and the damages which plaintiff might be
entitled to recover. Common report as to the existence of the crime, if
believed by the publisher, could be as well considered for this purpose
as would direct information received from reliable sources and acted upon
by him. If the purpose was to prove the truth of the charge, or in other
words to justify it, the ordinary rules of evidence that must be observed
in establishing facts in any case would be applicable in such a case; but it
is generally admitted as a rule that evidence in mitigation may often be
received, which would not be admitted or considered where the purpose
was to justify. This may be demonstrated by the rule which admits hear-
say, or, in other words, information received by the publishers from third
parties, to be proven, in order to disprove malice, and thereby to miti-
gate the damages that plaintiff may be entitled to. But such hearsay
evidence could not be received in order to establish the fact that a crime
was actually committed.

Now, while it is true that Jalonick was not in express terms informed
as to the existence of a general repute that the crime of violating the local
option law had been committed, still the information received by him was
of such a character that would imply that his informant, in making the
statement to him, was to some extent relying upon the opinion enter-
tained by the public as to that fact. The agent who furnished Jalonick
with this information states that it was generally reputed that a "blind

tiger" was being carried on and conducted in the building, and it is clear that Jalonick, in making the publication, relied upon the information received from this source; and it further appears that he acted in good faith in making the publication, believing at the time that the statements as to the occupancy of the building were true. Now, all of this information could be received in dispelling the presumption of malice that arises from the publication of the actionable words, where they charge the commission of a crime.

The connection between the information actually received and the opinion entertained by the public and the implication that arises from the statements made to Jalonick that it was, to some extent, based upon information, are so closely connected and associated, that it is difficult to determine that he and the local agent who assisted him in rating this particular building and designating its occupancy, did not in fact rely, in part, upon the opinion entertained by the public as to its occupancy. It is admitted that if Jalonick, at the time of the publication, actually knew of the general report concerning this matter, it would be proper to consider it in mitigation of damages; but, as said before, while it does not appear from the evidence, in express terms, that he had knowledge of such a public rumor, still the language used by the local agent in informing him as to the occupancy of the building implies that the agent was not basing his statement upon personal knowledge, but more likely upon information. It is clear that the agent at the time that the information was furnished knew of the existence of such common report, and it is clear that Jalonick, in making the publication, acted upon the statements received from the agent.

From these circumstances, we are not prepared to hold that there was any error in admitting this testimony. But, independent of all this, if we could hold that the testimony in this respect was objectionable, it would not lead to a reversal of the case, because it is clear, from the great weight and preponderance of evidence in the record, that in the building was carried on and conducted a business in violation of the local option law. The jury would have evidently reached that conclusion if this testimony had not been before them, because there is no other reasonable view to take of the evidence; and, in view of this state of fact, it would be folly to reverse the case in order to exclude evidence, which, if done, we are prepared to hold would not change the result. But, in view of the fact that we have held beyond any question that a part of the testimony objected to is admissible, we might well dispose of this objection by repeating what is said by the Supreme Court, in the recent case of Railway v. Gormley, 43 Southwestern Reporter, 880: "The trial court did not err in overruling the objection to the testimony of Robinson, as shown in bill of exceptions number 4, because a part of it was admissible, and the objection was to the whole. The court was not required to separate the admissible from what was inadmissible. The objector should do that. If the evidence did not show that the agent, to whom notice was given, had such connection with the tank as to make it his duty to give

notice of its condition or to repair it, that part of the evidence should have been excluded on proper objection or motion."

There was no error in the court's excluding the testimony set out in the second assignment of error. The publication itself was the best evidence of the charges made in it; and further, the matter here sought to be proven was in nowise connected with the alleged libel declared upon. This excluded evidence related to an entirely different charge, made against different parties as to the occupancy of other buildings in nowise connected with the building of plaintiff Schulze or the business carried on therein. It was a separate and distinct transaction, relating to other parties.

The subsequent publication made by Jalonick long after the pamphlet which contained the alleged libel charged in the petition, could serve no useful purpose as evidence bearing on any issue in this case. It was not declared upon by the petition, and was simply a correction as to the form of publication that had been previously made.

There was no error in excluding the testimony of witness Dugger, as complained of in the fourth assignment of error. It was not admissible to prove a combination between the appellee insurance company and the other insurance companies mentioned by the witness, because there was no pleading raising that issue. The witness Dugger, as agent for the insurance companies; received from the companies the pamphlet in question, which he was instructed to use in his business as the agent for the insurance companies, and be governed and controlled by it in making contracts for insurance. He testified that he showed the pamphlet to several persons, but it is clear that his conduct in this respect would not bind his principles for whom he was acting. The pamphlet was not furnished him for the purpose of conveying the information it contained to the public, but was to guide him as the agent of the companies, to be used by him in the conduct of their business. His testimony does not tend to show that he received authority from the companies to publicly use the pamphlet, nor does it appear that they had notice or knowledge of such conduct upon his part, but the information he gave as to its contents was, it appears, upon his sole responsibility, and it was not any part of his duty as the agent to furnish the public with information as to the contents of that document, nor does it appear that the information contained in this pamphlet was necessary to be given to the public when he was transacting any business for his principals.

The first paragraph of the charge of the court is not subject to the criticism urged in the fifth assignment of error. The first and second paragraphs of the charge are as follows:

"1. In order to entitle plaintiff to recover, it must reasonably appear from a preponderance of the evidence, first, that the alleged charge is libelous in its nature; second, that the defendant did publish and circulate it as alleged; third, that plaintiff was injured thereby, as alleged.

"2. To carry on what is termed a 'blind tiger' in a community where the sale of liquor is prohibited by law is a criminal offense, and a publica-

tion charging a person with committing such offense constitutes libel, and would entitle the person thus charged to damages."

It is contended that the charge leaves it to the jury to determine whether running a "blind tiger" was libelous per se. Reading the two charges together, as above stated, is clearly an answer to this objection. The court in the first simply stated the issues that must be established by the plaintiff. In the second is a specific instruction to the effect that carrying on a "blind tiger" is a criminal offense. The jury, who are supposed to have been men of ordinary intelligence, could not have been misled or confused by this charge.

The appellant misconstrues the effect of the fifth paragraph of the charge complained of in the sixth assignment of error. When that paragraph is considered with the others bearing upon that question, it does not leave to the jury the determination of the question whether a charge of running a "blind tiger" was libelous, because the court had instructed them in explicit terms that conducting a "blind tiger" was a crime in law.

Immediately preceding this charge, the court in subdivision 4 of the charge left to the jury a determination of the question whether the publication charged Schulze with carrying on and conducting a "blind tiger," or whether it was simply intended to charge that the building was occupied by some one as a "blind tiger." Now, when the court in the fifth subdivision of the charge told the jury that if they should find from the evidence that the statement in the pamphlet in question is libelous, it was intended to be taken in connection with the previous instructions; that is, if the jury believed that the publication could be so construed as to charge Schulze with conducting a "blind tiger," then recovery could be had against one or both of the defendants, who, according to the evidence, published the charge.

The seventh assignment of error is as follows: "The court erred in paragraph 6 of its charge to the jury in this: 1. The court assumes in said paragraph that good faith in making a libelous charge constitutes part, at least, of such charge as privileged and excusable, when in law, good faith, either in whole or in part, can not make or constitute such charge a privileged communication or excuse or justify same. In law, good faith can only operate in mitigation of damages. 2. The court assumed, by charging the jury on the subject, that defendants had an interest in or a duty to perform towards each other and to the general public in a moral or social sense, in communicating the fact that a "blind tiger' was kept and run in plaintiff's building, when, as a matter of fact, there was no evidence before the court or jury that the defendants owed any duty, the one to the other or to the general public, in a moral or social sense, or had any interest of the fact of a 'blind tiger' being kept and run in plaintiff's building, for the reason that there was no evidence before the court and jury that the keeping and running of a 'blind tiger' in plaintiff's building would either increase or diminish the hazard or

risk of the insurance of said building or any contiguous building. In law, if the keeping and running of a 'blind tiger' in plaintiff's building did not increase or diminish the risk or hazard of the insurance on plaintiff's building, the fact that a 'blind tiger' was kept and run in plaintiff's said building was a matter in which defendants had no interest to protect on said building by reason of a 'blind tiger' being kept and run in it, or duty to perform in communicating the same to each other or to their agent or agents or to the general public, either morally or socially, and the publishing or communicating such fact, in law, was not privileged.   3.   In law, privilege can only arise to protect the publisher or communicator of a libel when the statement or communication of the fact is necessary to protect the legal interests or property of the party publishing the libel, or the legal interests of the person to whom the same is communicated, as when, under such circumstances, the relation of principal and agent exists between the parties, in law, the agent is privileged, and it is his duty to communicate any fact to his principal necessary for the protection of his interests or property; and the principal is privileged to communicate any fact to the agent necessary to enable him to protect the interests of the principal.   4.   In law, a corporation, whose business is fire insurance, or the agents of such corporation, as such, owe no more duty to the State or to the general public in a moral or social sense than any other private citizen, and can claim no higher or broader protection or privilege in law; it or its agents owe no duty to any individual, except to those whose property they insure.   5.   Said charge was erroneous, because in the absence of all evidence before the court and jury to show an interest or duty on the part of defendant on account of a 'blind tiger' being kept and run in said building, it was calculated to mislead the jury in reference to good faith and interest or duty, rendering said charge privileged."

There is much in this assignment in the nature of an argument which is improper to be embraced in an assignment of error; but as it presents one of the principal questions in the case, that is whether the publication was privileged, we set it out here in full, and will take occasion here to dispose of all the questions raised in appellant's brief relating to that issue.

The sixth paragraph of the charge complained of in this assignment is as follows: "A communication made in good faith upon any subject matter in which the party communicating has an interest, or in reference to which he has a duty, public or private, either legal, moral or social, if made to a person having a corresponding interest duty, is privileged. Communications within the privilege are not actionable merely because they are false and defamatory, but express malice must be shown."

In this connection, we will state the balance of the charge bearing upon this issue:

"7.   If you believe from the evidence that the defendant, Jalonick, in the pursuit of his business of collecting facts concerning all such matters as may affect the risk of insuring buildings and property, printed

in the pamphlet in evidence the matters therein stated in regard to the building of plaintiff, and stated therein that the occupancy thereof was 'blind tiger,' that he did so believing it true, and in good faith, and furnished said pamphlet to the defendant company and other insurance companies in the usual course of business, for the purpose of furnishing them such information as is commonly needed and obtained by insurance companies, such publication would be privileged, and the defendant would not by reason thereof be liable to damages. And if you further believe from the evidence that the defendant company, the Pennsylvania Fire Insurance Company, merely used the pamphlet thus obtained by sending it to their agent or agents in the town of San Marcos, with instruction to be governed by the rates and other contents of the book in attending to and transacting the business of the company, and that they did so believing the information obtained from such publication to be true, and did not instruct their agent or agents to use such information for any purpose except the business they transacted for defendant, such publication and communication would be privileged, so far as the defendant company is concerned, and would not subject them to damage.

"8. If you find from the evidence that the agent or agents of the defendant corporation showed and exhibited the publication in question as to Alvin Schulze to the public or to any individuals constituting the public, but did so without instructions or authority from their principal, the defendant corporation is not responsible for such circulation of the publication."

The appellant misconceives the purpose and meaning of the charge quoted. This issue was not submitted to the jury in mitigation of damages sustained by the plaintiff, but as a complete defense and bar to the plaintiff's cause of action. If the communication or publication was privileged, and the defendants in publishing it were not actuated by malice, they would not be liable. Good faith of the publisher may be considered in determining whether he was prompted by malice in availing himself of his privilege. There are facts and circumstances in the record which show that, by reason of the business relationship existing between Jalonick and the insurance companies, he rested under the duty to furnish them correct and true information as to the location and occupancy of buildings situated in the town of San Marcos. In publishing this information it was not intended that the public generally should be furnished with it, but it was intended for the use of Jalonick and the insurance companies and their subordinate agents in the business in which they were engaged. The information received from this publication was intended to be acted upon in effecting insurance upon buildings and properties located within them. It was for the guidance of the companies which the evidence in effect shows Jalonick was at the time serving. A correct statement as to the occupancy of buildings was a part of the information that should be furnished, as it would have much bearing upon the rates and character of the risk

assumed by the companies. Jalonick testifies upon this question, "the character of the occupancy affects the price of insurance."

From the brief recapitulation of the evidence upon this question it is apparent that it was proper for the court to submit to the jury the question of privilege, and in this connection, in answering a criticism contained in another assignment of error to the charge, it is proper to say that the court did not leave to the jury the determination whether the publication was privileged, but left to them the right to ascertain the facts upon which the privilege was based, telling them, that if they should find the combination of facts to be true which was submitted to them, then the publication would be privileged. "A communication made in good faith upon any subject matter in which the party communicating has an interest, or in reference to which he has a duty, public or private, either legal or moral or social, if made to a person having a corresponding interest or duty, is privileged." 13 Am. and Eng. Enc. of Law, 403.

The Supreme Court of this State, in passing upon a similar question in the case of Railway v. Richardson, 73 Texas, 575, uses this language. "We understand the law to be that a communication made in good faith in reference to a matter in which the person communicating has an interest or in which the public has an interest, is privileged, if made to another for the purpose of protecting that interest, and that a communication made in the discharge of a duty and looking to the prevention of a wrong towards another or the public is so privileged, when made in good faith. In such cases, although the statements made may have been untrue, malice can not be implied from the fact of publication, and to sustain an action in which the existence of evil motive must be proved.

"In the case of Harrison v. Bush, (5 El. & Bl., 348), it was said: 'A communication made bona fide upon any subject matter in which the party communicating has an interest, or in reference to which he has a duty, is privileged, if made to a person having a corresponding interest or duty, although it contained criminatory matter which, without this privilege, would be slanderous and actionable. * * * 'Duty,' in the proposed canon, can not be confined to legal duties which may be enforced by indictment, action, or mandamus, but must include moral and social duties of imperfect obligation.

"When words imputing misconduct to another are spoken by one having a duty to perform, and the words are spoken in good faith and in the belief that it comes within the discharge of that duty, or where they are spoken in good faith to those who have an interest in the communication and a right to know and act upon the facts stated, no presumption of malice arises from the speaking of the words, and therefore no action can be maintained in such cases without proof of express malice. If the occasion is used merely as a means of enabling the party to utter the slander to indulge his malice and not in good faith to perform a duty or make a communication useful and beneficial to others, the occasion will

furnish no excuse. Bradley v. Heath, 12 Pick., 164; Noonan v. Orton, 32 Wis., 112; Harper v. Harper, 10 Bush., 455; Harwood v. Keech, 4 Hun, 390; Townshend on Libel and Slan., 241-245."

The facts and circumstances surrounding this publication bring it within the rule announced by these authorities. The evidence clearly shows that the parties, in making the publication and using it, did not entertain towards plaintiff any malice whatsoever.

The business in which Jalonick was engaged was for the benefit of the insurance companies, to furnish them correct information as to subjects of insurance. He rested under the duty, as a part of his functions, to state the true condition of affairs as he found them. This was a duty owing to the insurance companies; otherwise, the information received would be more harmful than useful, as its tendency would be to mislead and deceive the companies. They, in a like manner, in order to protect themselves, had the privilege of conferring the information received upon their local agents, and this really was necessary in order that the agents might intelligently act in the matter of effecting insurance upon properties. In furnishing the agents this information they did not confer any authority upon them to transmit it to the public generally, and no implied power exists, by virtue of such agency, that would authorize them, against the consent of their principals, the insurance companies, to use and circulate these publications among the public. They were intended solely for the private information of the insurance companies and the agents, and if the agents made use of them otherwise, in giving a public notoriety of their contents, it might fix the liability upon them, but not against their principals.

What we have said in effect disposes of the eighth, ninth, tenth, and eleventh assignments of error.

In response to the twelfth and thirteenth assignments of error, it may be said that there was no evidence showing that the agents had any authority whatever from Jalonick or the insurance companies to publicly exhibit the publications. These charges are in effect upon the weight of evidence, and make the defendants responsible for the unauthorized acts of the agents in circulating the publications, and they ignore that phase of the case which justifies the publications if privileged.

In reply to the fifteenth assignment of error, it is sufficient to say that the charge of the court on the measure of damages was proper, and it was no error to refuse the charge requested.

There was no error in refusing to give the charges requested, as set out in the fourteenth, sixteenth, and seventeenth assignments of error, because they present such a state of case as would authorize the jury to find against the defendants, notwithstanding the publication may have been privileged. They ignore that issue in the case.

What has been previously said disposes of the eighteenth and nineteenth assignments of error, and both of the charges requested and refused, as set out in these assignments, are upon the weight of evidence.

In response to the twentieth assignment of error, it is proper to say that there is evidence which sustains the verdict upon two propositions: First, although there is testimony both ways upon the question, there is evidence which warrants the conclusion that the publication stating that the occupancy of the building as a "blind tiger" did not refer to the plaintiff Schulze as the occupant. This court previously held, on the former appeal of this case, that the meaning of the publication was uncertain. Some of the witnesses on the trial of this case testified, in giving a meaning and their interpretation to the publication, that it was not calculated to convey the information that Schulze was charged with running a "blind tiger;" but as said before, there is much evidence to the contrary, tending to show that it was so construed by many persons living in San Marcos to mean that Schulze was occupying the building as a "blind tiger." Second, the facts in the record strongly tend to establish that the publication was privileged.

There was no error in excluding the evidence stated in the twenty-first assignment of error. It is admitted that the testimony of the witness Judge Wood, which was excluded, was not included in the bill of exceptions. Further, we fail to see the relevancy of the second publication made by Jalonick, offered in connection with the evidence of witness Wood. It was not declared on. It would serve little if any purpose in explaining the previous publication which was declared on as containing the libel charged.

The twenty-second and twenty-third assignments of error are too general to be considered.

We find no error in the record, and the judgment is affirmed.

*Affirmed.*